IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Roslynn C.,[1] | ) | C/A No.: 1:21-cv-618-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[2] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable J. Michelle Childs, United States District Judge, dated April 15, 2021, referring this matter for disposition. [ECF No. 11]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former Commissioner Andrew Saul as the defendant in this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

    A.    Procedural History

On October 9, 2019, Plaintiff filed an application for DIB in which she alleged her disability began on August 16, 2017. Tr. at 67, 136–39. Her application was denied initially and upon reconsideration. Tr. at 81–84, 88–91. On December 7, 2020, Plaintiff had a telephonic hearing before Administrative Law Judge ("ALJ") Amanda Craven. Tr. at 28–52 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 23, 2020, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–27. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 3, 2021. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 27 years old at the time of the hearing. Tr. at 35. She completed two years of college. *Id.* Her past relevant work ("PRW") was as a customer service call center operator, a radio operator, and a plastic machine operator. Tr. at 35–37. She alleges she has been unable to work since August 16, 2017. Tr. at 136.

2.    Medical History

Plaintiff was hospitalized at Marshall I. Pickens Hospital from November 9 to November 11, 2016, following a suicide attempt by hanging. Tr. at 224. She endorsed increased anxiety related to the election results and reported a history of suicide attempt by hanging in 2014, while serving in the Navy. *Id.* She was noted to be a transgendered male-to-female and reported she had been without hormone medications for three months due to her inability to afford them. Tr. at 226. Justin Zeppieri, M.D., diagnosed major depressive disorder ("MDD"), recurrent, without psychotic features. Tr. at 228.

On April 4, 2017, Plaintiff presented to Christopher Montes, M.D. ("Dr. Montes"), for a psychiatry intake consultation. Tr. at 275. She endorsed depression and suicidal ideation due to a traumatic history. *Id.* She indicated she had no psychiatric problems prior to entering the Navy. *Id.* She reported

she was forced to work 36-hour shifts and subjected to physical and sexual harassment while stationed on a submarine at the North Pole. *Id.* She indicated she had attempted suicide twice during her service. *Id.* She described low energy, anhedonia, avolition, poor sleep, hopelessness, and loss of confidence as related to depression. *Id.* She endorsed chronic anxiety throughout the day. *Id.* Dr. Montes recorded normal findings on mental status exam ("MSE"), aside from depressed mood, blunted/congruent affect, and fair insight and judgment. Tr. at 276–77. He diagnosed posttraumatic stress disorder ("PTSD") and gender dysphoria and prescribed Prozac 20 mg. Tr. at 277.

Plaintiff presented to clinical psychologist Jerry W. Noble, Ph.D. ("Dr. Noble"), for a compensation and pension exam on October 12, 2018. Tr. at 298–305. Dr. Noble noted Plaintiff did not have a diagnosis of PTSD that conformed to Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5") criteria. Tr. at 298. He identified Plaintiff's mental disorder diagnoses as unspecified depressive disorder and gender dysphoria. *Id.* He indicated Plaintiff had occupational and social impairment with reduced reliability and productivity. *Id.* Plaintiff reported being a student and living on a university campus during the school year and with her maternal grandmother during academic breaks. Tr. at 299. She indicated she had a few close friends, but felt "a little panicky" and exited when exposed to

4

more people and noise. *Id.* She reported sexual trauma and repeated sleep interruptions and short sleep intervals while serving aboard a submarine and claimed her complaints were dismissed as hazing. Tr. at 300. She indicated she was starting her junior year of college and was a "strong, stable B student" and was "doing really well" socially. *Id.* She admitted her attendance was fair and had been negatively affected by depressive episodes. *Id.* Dr. Noble identified Plaintiff's symptoms as depressed mood, anxiety, panic attacks that occurred weekly or less often, disturbances of motivation and mood, suicidal ideation, and difficulty in adapting to stressful circumstances, including work or a work-like setting. Tr. at 303. He indicated normal findings on MSE, aside from anxious mood and persisting suicidal ideation. Tr. at 304. Plaintiff's score on the Minnesota Multiphasic Personality Inventory-2 Restructured Form suggested over-reporting of psychological symptoms and/or significant emotional distress. *Id.* Dr. Noble noted other test results also suggested likely over-reporting of psychological symptoms. *Id.* He stated "other test results were interpreted cautiously" to suggest Plaintiff "may have significant emotional distress, e.g., depression and anxiety"; "may have a broad range of psychological symptoms"; "reported significant emotional turmoil, feeling overwhelmed and being unhappy with her life circumstances"; "may have a depressive disorder"; "reported negative emotional experiences including anxiety, anger and fear"; and "may have

intrusive ideation, sleep problems, excessive worry and high reactivity to stress." *Id.*

Plaintiff presented to psychiatrist Jason Gandy, M.D. ("Dr. Gandy"), for follow up as to PTSD and gender dysphoria on February 1, 2019. Tr. at 269–70. She endorsed stressors related to being in school and said she was no longer taking Hydroxyzine. Tr. at 269. She reported increased appetite and sleep irregularity due to inability to slow her thoughts. *Id.* She indicated she frequently spent time with friends and family. *Id.* She endorsed PTSD symptoms that included hypervigilance, nightmares, intrusive thoughts, and intermittent irritability. *Id.* She denied suicidal and homicidal ideations. *Id.* Dr. Gandy noted normal findings on MSE. Tr. at 270. He increased Prozac to 40 mg for PTSD, continued Prazosin 1 mg for nightmares, and prescribed Trazodone 25–50 mg, as needed for sleep. *Id.*

On June 1, 2020, clinical social worker Elizabeth Harmon Ledlow ("SW Ledlow") indicated in a letter that she had provided outpatient therapy to Plaintiff since November 15, 2016. Tr. at 306. She noted Plaintiff first presented to her office following her hospitalization at Marshall I. Pickens Hospital. Tr. at 307. She stated Plaintiff initially presented with depression, excessive sadness, hopelessness, anhedonia, decreased energy, crying spells, anxiety, worry, emotional numbness, occasional nightmares, flashbacks, social withdrawal, and difficulty functioning in her work environment due to

crying spells and impaired focus/concentration. *Id.* She reported Plaintiff subsequently endorsed increased flashbacks, re-experiencing of traumatic incidents, and nightmares, which led to a diagnosis of PTSD on September 9, 2017. *Id.* She stated Plaintiff had moderate-to-severe depressive episodes multiple times per year during which she reported excessive fatigue and sleep, decreased energy, poor concentration, poor hygiene, anhedonia, social isolation, feelings of hopelessness, somatic pains (headaches), and lethargy. *Id.* She noted Plaintiff had difficulty complying with therapeutic interventions, including consistently learning and implementing therapeutic skills. *Id.* She explained that Plaintiff had been employed when she initiated counseling, had stopped working by the end of 2017, and had started an undergraduate degree program in January 2017. Tr. at 308. She noted Plaintiff enjoyed the educational environment, but often missed classes due to decreased energy, lower motivation, and increased fatigue. *Id.* She indicated Plaintiff showed greater functional impairment by April 2018 and withdrew from college following the Spring 2019 semester. *Id.* She stated therapy had allowed Plaintiff to process and cope with traumatic events, receive social support, increase coping skills, and decrease suicidal ideation, but she had demonstrated difficulty adhering to evidence-based therapeutic skills and had "not necessarily improved" in her "overall level of functioning." *Id.* Treatment plans reflect recommended treatment frequency of every two

or three weeks, but SW Ledlow did not include individual treatment notes or provide information as to how frequently Plaintiff actually attended counseling visits. *See* Tr. at 311, 312.

On June 25, 2020, Plaintiff presented to John C. Whitley, III, Ph.D. ("Dr. Whitley"), for a consultative psychological evaluation. Tr. at 322–25. She reported receiving treatment from SW Ledlow once a month since November 2016. Tr. at 323. She reported anxiety-related symptoms that included paranoia of others hurting her, anxiety around new people, difficulty trusting others, history of suicide attempts, and panic attacks once or twice a week. *Id.* She endorsed depressive symptoms that included agitation, frustration, hopelessness, guilt, fatigue, crying, difficulty sleeping, difficulty concentrating, feeling worthless, feeling out-of-control, losing interest in activities, and being easily distracted. *Id.* She reported having developed PTSD due to physical, verbal, and sexual abuse while in the military. *Id.* She indicated she was able to dress and care for hygiene, spend time with family, infrequently attend church, write, use a cell phone and the internet, listen to music, watch television, play video games, read, cook on the stove and using the microwave, make her bed, and wash and fold clothes. Tr. at 323–24. She denied washing dishes, as the action triggered unpleasant memories from her time in the Navy. Tr. at 324. She endorsed varied sleep patterns with some difficulty falling asleep and nightmares. *Id.* She admitted she had a driver's

license, but said she rarely drove independently because of anxiety. *Id.* She indicated she could manage her finances and shop in stores if accompanied by a family member. *Id.* She admitted to isolating from family at times. *Id.*

Dr. Whitley interviewed Plaintiff's stepmother, who accompanied her to the interview. *Id.* Her stepmother reported Plaintiff had changed drastically since returning from the military, struggled with sleep and focus, experienced night terrors, had to maintain a schedule, often isolated, had social difficulties, was consistently anxious and worried, and experienced panic attacks. *Id.*

Dr. Whitley observed Plaintiff to have a dysthymic emotional state with high anxiety. *Id.* He noted Plaintiff was polite, responsive, had adequate eye contact, was appropriately dressed, and had good hygiene. *Id.* He reported Plaintiff had normal speech and her grammar, language, and fund of information were consistent with average intelligence. *Id.* He indicated Plaintiff demonstrated no evidence of malingering. *Id.* He stated it was difficult to establish rapport with Plaintiff, given her anxiety. *Id.* He noted Plaintiff had adequate impulse control and intact judgment and insight. *Id.* He indicated Plaintiff had somewhat limited remote, recent, and immediate memory, recalling two of four items after a two-minute delay with interference task and a 15-minute delay. *Id.* He stated Plaintiff was able to recite three digits forward and backward, was properly oriented, and could

name the current and most recent prior President of the United States. Tr. at 324–25. He reported Plaintiff recited serial threes and fives forward and serial sevens forward to 21 and backward to 86. Tr. at 325. He noted Plaintiff had adequate proverb interpretation and abstract reasoning skills, could perform simple subtraction, and could spell "world" forward, but not backward. *Id.* He stated Plaintiff showed no evidence of loosening of associations and had lucid, coherent, organized, adequate, and fluid thoughts. *Id.* He described Plaintiff's mood as dysthymic and her affect as anxious, but noted she had adequate energy, denied suicidal and homicidal thoughts, and had no evidence of hallucinations or delusions. *Id.*

Dr. Whitley's diagnostic impressions were: (1) major depression, moderate, recurrent; (2) PTSD; (3) panic disorder; (4) rule out generalized anxiety disorder; and (5) history of gender dysphoria. He wrote the following:

> He continues to experience a low level of depression on a consistent basis. He reports and presents with symptoms of posttraumatic stress disorder secondary to his trauma. He presents with symptoms of panic disorder and excessive anxiety dealing with public and people in general. He understood the conversational speech and should be able to engage in reciprocal conversations with others. He appears to have the ability to understand and follow multiple-step instructions in a low stress, low demand work environment. In light of his anxiety, he would function best in a work setting with minimal interaction with the public or large numbers of co-workers. It is felt that he would decompensate quickly under anything more than simple levels of demands and expectations. He understands concepts of caution and danger. His ability to maintain persistence in general at this time will be of a moderate impairment for anything more than basic tasks. He can complete basic [activities of daily living]. He

appears capable of organizing a work schedule as well as his own personal finances. Prognosis is felt to be fair with consistent counseling.

*Id.*

On June 29, 2020, state agency psychological consultant Blythe Farish-Ferrer, Ph.D. ("Dr. Farish-Ferrer"), reviewed the record and considered Listings 12.04 for depressive, bipolar, and related disorders, 12.06 for anxiety and obsessive-compulsive disorders, and 12.15 for trauma and stressor-related disorders. Tr. at 59–61. She rated Plaintiff as having mild difficulties in her abilities to understand, remember or apply information and adapt or manage oneself and moderate difficulties in her abilities to interact with others and concentrate, persist, or maintain pace. *Id.* She wrote: "While it is concluded that cl[aimant's] mental impairments are severe, these impairments are not expected to preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public." Tr. at 61. In assessing Plaintiff's mental residual functional capacity ("RFC"), Dr. Farish-Ferrer noted she was moderately limited as to the following abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public;

and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 62–64. She wrote:

> Due to cl[aimant's] mental pr[oblems], this cl[aimant] may have difficulty attending to complex tasks, but should be able to attend to and perform simple tasks two plus hours at a time without special supervision. Cl[aimant] can attend work regularly, needing to miss no more than an occasional day due to mental illness. The cl[aimant] can accept supervision, but may not be suited for work with the general public. The cl[aimant] can use public transportation, make work-related decisions, and protect from work-related safety hazards.

Tr. at 64.

On July 29, 2020, a second state agency psychological consultant, Jennifer Steadham, Ph.D. ("Dr. Steadham"), reviewed the record, considered the listings, and assessed the same degree of limitation in the four functional areas and mental RFC as Dr. Farish-Ferrer. *Compare* Tr. at 59–64, *with* Tr. at 72–77.

Plaintiff had a telephonic mental health visit with Dr. Gandy on August 27, 2020. Tr. at 331. She indicated she had been taking Trazodone and Prazosin since earlier in the month. Tr. at 332. She endorsed nightmares, anxiety, and flashbacks due to depression and anxiety related to going outside alone. *Id.* She reported chronic PTSD symptoms that included hypervigilance, nightmares, intrusive thoughts, and intermittent irritability. *Id.* She indicated her sleep had improved on medication, although she still struggled with shutting off her mind to fall asleep. *Id.* Dr. Gandy noted

Plaintiff had last followed up with him in February 2019 and had missed visits in April and May 2019. *Id.* He indicated Plaintiff's father had called to request mental health visits for her in March and August 2020. *Id.* Dr. Gandy recorded normal findings on MSE. Tr. at 332–33. He prescribed Sertraline 50 mg for PTSD and mood, increased Trazodone from 50 to 100 mg for sleep, and continued Prazosin for nightmares. Tr. at 333.

SW Ledlow provided an updated letter on November 19, 2020. Tr. at 342–43. She wrote: "The client periodically misses appointments with this clinician as well as other providers. There have been periods where the client has dropped out of treatment for several months." Tr. at 342. She noted therapy "ha[d] not necessarily improved the client's overall level of functioning." Tr. at 343.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

Plaintiff testified she lived with a friend. Tr. at 35. She denied having attempted to work since August 2017. *Id.* She stated she had last worked at Direct Outbound Services as a contractor in a customer service call center. *Id.* She said she dealt with customer complaints and provided technical support. Tr. at 36. She indicated the job required mostly sitting and no lifting. *Id.* She stated she had previously worked for Cooper Standard Automotive as a

general plastics manufacturer. *Id.* She estimated she lifted 50 to 100 pounds while performing that job. *Id.* She said she had previously served in the military as a submarine radioman. Tr. at 37.

Plaintiff testified she had quit her job with Direct Outbound Services due to her employer's reaction to her hospitalization for a suicide attempt. Tr. at 38. She stated she had attempted to earn a bachelor's degree over the two years that followed, but failed to progress due to failing grades and left college nearly two years prior. *Id.* She explained she had been able to live on campus at Limestone College because she either had a room to herself or a roommate she trusted. Tr. at 39. She indicated she had failed classes because she would remain in her room for weeks and fail to attend classes. *Id.* She stated she had experienced paranoia over leaving her dorm room and feared something bad would happen or she would be punished if she left. *Id.*

Plaintiff said her depression, anxiety, and PTSD prevented her from working. *Id.* She stated she was regularly unable to leave her home. *Id.* She admitted she had missed multiple counseling sessions because of difficulty leaving her home, as well as sleeping through appointments. Tr. at 40. She said she had previously attempted suicide on two occasions, but had only been hospitalized once. *Id.*

Plaintiff testified she had suicidal thoughts almost daily. *Id.* She said she feared being around others she did not know and trust. Tr. at 41. She

14

admitted she had some difficulty working around others in her last job, but said she was in her own cubicle and could "hyper-focus" on the job, despite the presence of coworkers around her. *Id.* She said the fact that she could not see her coworkers and could focus on the task at hand made it somewhat manageable. Tr. at 41–42. She indicated she had difficulty interacting with customers. Tr. at 41. She said she was often in trouble because of her problems interacting with customers over the phone. *Id.* She stated she experienced feelings of hopeless and worthlessness daily. Tr. at 42.

Plaintiff testified she could perform most household chores if she was having a good day, but often had long periods between good days. *Id.* She estimated she had three or four good days per month. *Id.* She said that during some periods, she could not remember things, get out of bed, or leave the house. *Id.* She said she would have food delivered, did not clean on bad days, and was not responsible for yardwork, as her landlord hired someone to handle it. *Id.* She denied participating in social activities outside her home, such as going to movies and restaurants, church, clubs, and civic organizations. *Id.* She admitted she had a driver's license, but said she needed someone to accompany her when she left her home. Tr. at 43. She testified she panicked if she lost sight of the person who accompanied her during the time she was away from home. *Id.* She said she could not visit the grocery store or pharmacy by herself. *Id.*

Plaintiff stated her ability to handle change varied depending on the type of change. *Id.* She said she would shut down and be unable to function if a change resulted in a delay or cancellation of an event she considered important, but would feel relief if an event were cancelled that had caused her anxiety. *Id.*

b. Vocational Expert Testimony

Vocational Expert ("VE") Kenneth Ogren reviewed the record and testified at the hearing. Tr. at 44–48. The VE categorized Plaintiff's PRW as a customer service call center operator, *Dictionary of Occupational Titles* ("*DOT*") No. 249.362-026, requiring sedentary exertion and a specific vocational preparation ("SVP") of 4; a radio operator, *DOT* No. 193.267-026, requiring light exertion per the *DOT* and sedentary exertion as performed and an SVP of 6; and a plastic machine operator, *DOT* No. 279.157-010, requiring light exertion per the *DOT* and heavy exertion as performed and an SVP of 6. Tr. at 45. The ALJ described a hypothetical individual of Plaintiff's vocational profile who would have no exertional limitations and the following restrictions: limited to simple, routine tasks with a reasoning level of 2 or less, performed in two-hour blocks of time; no more than occasional public contact in the workplace and no more than occasional contact with coworkers; could work in proximity to others, but could not participate in team-type activities; and limited to occasional, routine changes in work settings and

duties. Tr. at 45–46. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 46. The ALJ asked whether there were any other jobs in the economy the hypothetical person could perform. *Id.* The VE identified jobs at the medium exertional level with an SVP of 2 as a night cleaner, *DOT* No. 381.687-018, a packager, *DOT* No. 920.587-018, and a laundry worker, *DOT* No. 361.684-014, with 255,000, 633,000, and 209,000 position in the national economy, respectively. *Id.*

For a second hypothetical question, the ALJ asked the VE to consider the restrictions in the first hypothetical and to further assume the individual would miss one day of work per month. *Id.* He asked the VE to indicate the effect of the additional restriction. *Id.* The VE testified the same jobs remained available in the same numbers. Tr. at 47.

For a third hypothetical question, the ALJ asked the VE to add a limitation to the prior questions that the individual would be off task for 15% or more of the workday, in addition to regular breaks, or would miss two or more days per month. *Id.* He asked the VE to indicate the effect on the jobs previously identified. *Id.* The VE stated there would be no jobs if the individual were either off task for 15% or more of the workday or absent on two or more days per month. *Id.* He confirmed his testimony was consistent with the *DOT*, except that his testimony as to attendance and time off task

was based on his 45 years of job placement experience and work with employers. *Id.*

Plaintiff's counsel asked the VE to consider a hypothetical individual of her vocational profile who was limited as described in the second hypothetical question, but could have no exposure to moving machinery or hazardous conditions; could have less-than-occasional interaction with coworkers and supervisors and no contact with the public; and could not participate in team-dependent or pace or production work in which one worker relies on another worker. Tr. at 47–48. He asked if the individual would be able to perform any of the jobs the VE previously identified. Tr. at 48. The VE testified the hand packager and laundry worker positions would be eliminated. *Id.*

Plaintiff's counsel asked the VE to further consider the individual would be unable to be within 10 feet of coworkers and supervisors. *Id.* The VE testified the additional restriction would eliminate all jobs. *Id.*

            2.      The ALJ's Findings

In her decision dated December 23, 2020, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
2.  The claimant has not engaged in substantial gainful activity since August 16, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.  The claimant has the following severe impairments: depressive disorder, anxiety disorder, posttraumatic stress disorder

(hereinafter PTSD), and gender identity disorder (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine tasks with a reasoning level of 2 or less, performed in 2-hour blocks of time. The claimant can have no more than occasional public contact in the work place, and no more than occasional contact with coworkers (may work in proximity to others but cannot participate in team type activities); the claimant is limited to only occasional, routine changes in work settings and duties and the claimant would miss approximately one day per month.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on October 5, 1993, and was 23 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 16, 2017, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 17–23.

II.    Discussion

Plaintiff alleges the Commissioner erred because the ALJ failed to address her moderate limitations in interacting with others and maintaining concentration, persistence, or pace in the RFC assessment.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must

consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues the ALJ's RFC assessment does not account for her moderate limitations in concentration, persistence, or pace and interacting with others. [ECF No. 14 at 7–15]. She maintains the ALJ failed to explain how she could perform tasks and stay on task at the required pace throughout an eight-hour workday. *Id.* at 7–11. She contends the ALJ's recitation of evidence without explaining how the evidence supported her conclusions was insufficient. [ECF No. 16 at 1–2]. She claims ALJ did not account for her moderate limitation in interacting with others because she included no provisions in the RFC assessment as to working in proximity to others and interacting with supervisors. ECF Nos. 14 at 12, 16 at 3. She maintains the ALJ did not explain the restrictions she included and omitted from the RFC as to ability to interact with others. [ECF No. 14 at 13–15].

The Commissioner argues the evidence supports the provisions the ALJ included in the RFC assessment, and she was not required to include additional restrictions the state agency consultants assessed. [ECF No. 15 at 6–7].

ALJs are required to use the special technique in 20 C.F.R. § 404.1520a in evaluating all cases involving mental impairments. After concluding a claimant has a medically-determinable mental impairment, the ALJ must rate the degree of the claimant's functional limitation as none, mild,

moderate, marked, or extreme based on "the extent to which [her] impairment(s) interfere with [her] ability to function independently, appropriately, effectively, and on a sustained basis" in the broad functional areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself." 20 C.F.R. § 404.1520a(b), (c)(2), (3), (4). If the ALJ concludes the mental impairments do not meet or are not equivalent in severity to any listed mental disorders, she is to consider the impairments in assessing the claimant's RFC. 20 C.F.R. § 404.1520a(d).

A claimant's RFC represents "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the ALJ is to "consider all of the claimant's 'physical and mental limitations, severe and otherwise, and determine on a function-by-function basis, how they affect [her] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)). The RFC assessment should reflect the ALJ's contemplation of all the relevant evidence, and she should address all the claimant's medically-determinable impairments. 20 C.F.R. § 404.1545(a)(1). The ALJ must include a narrative discussion citing "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explaining how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184,

at *7. She "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* "Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Pertinent to Plaintiff's argument, evaluation of a claimant's ability to concentrate, persist, or maintain pace requires consideration of her "abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(3). "[T]he nature of this area of mental functioning" addresses the following non-exclusive functions:

> initiating and performing a task that you know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

*Id.* Although these examples "illustrate the nature of this area of mental functioning," the ALJ is not required to document his consideration of all the examples. *Id.*

To evaluate a claimant's ability to interact with others, the ALJ must consider the claimant's "abilities to relate to and work with supervisors, co-

workers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(2).
Examples of this area of functioning including: "cooperating with others;
stating own point of view; initiating or sustaining conversation;
understanding and responding to social cues (physical, verbal, emotional);
responding to requests, suggestions, criticism, correction, and challenges; and
keeping social interactions free of excessive irritability, sensitivity,
argumentativeness, or suspiciousness." *Id.* Although these examples
"illustrate the nature of this area of mental functioning," ALJs are not
required to document consideration of all the examples. *Id.*

Prior to assessing Plaintiff's RFC, the ALJ engaged in the analysis
required pursuant to 20 C.F.R. § 404.1520a. *See* Tr. at 18. She found Plaintiff
had moderate limitations in interacting with others and concentrating,
persisting, or maintaining pace. *Id.* She summarized the evidence underlying
her conclusions as follows:

> The claimant testified she had not worked since she tried to earn
> her English degree. She lived on the campus most of the time, but
> would hole up in the room for weeks on end and not go to class
> due to paranoia. She stayed in her safe place. She testified that
> she could not work now because [of] depression, anxiety, and
> PTSD. She could not leave her own home and she did not think
> anyone would hire her. She alleged that she constantly fought the
> urge to kill herself, especially if around people she did not know
> or not trust. She had problems with her interactions with others.
> However, if people were working in cubes, her situation was
> somewhat manageable. She also had feelings of worthlessness.
> On a good day, she could do most of her household chores. She
> did have a driver's license, but alleged that someone needed to go

anywhere with her. That way, she could focus her attention and being outside became manageable for her.

*Id.*

The applicable regulations specify that moderate limitation means "[y]our functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(F)(2)(c). Thus, the ALJ found Plaintiff had fair functioning in interacting with others and concentrating, persisting, or maintaining pace.

Having determined Plaintiff's mental impairments did not meet or equal a listing, the ALJ considered them in assessing the RFC. *See* Tr. at 18. She addressed Plaintiff's moderate limitations in concentrating, persisting, or maintaining pace by indicating she could "perform simple, routine tasks with a reasoning level of 2 or less, performed in 2-hour blocks of time," was "limited to only occasional, routine changes in work setting and duties," and "would miss approximately one day per month." Tr. at 19. She accommodated Plaintiff's moderate limitations in interacting with others by finding she could "have no more than occasional public contact in the work place, and no more than occasional contact with coworkers (may work in proximity to others but cannot participate in team type activities)." *Id.*

The Fourth Circuit has "agree[d] with other circuits that an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or

unskilled work." *Mascio*, 780 F.3d at 638. In *Mascio*, the court considered remand appropriate based on the record before it "because the ALJ here gave no explanation." *Id.* However, the court recognized that a restriction to simple, routine tasks or unskilled work could account for significant restrictions to concentration, persistence, or pace if the ALJ provided an appropriate explanation. *See id.*; *see also Sipple v. Colvin*, C/A No. 8:15-1961-MBS-JDA, 2016 WL 4414841, at *9 (D.S.C. July 29, 2016), adopted by 2016 WL 4379555 (D.S.C. Aug. 17, 2016) ("After *Mascio*, further explanation and/or consideration is necessary regarding how Plaintiff's moderate limitation in concentration, persistence, or pace does or does not translate into a limitation in his RFC.").

The ALJ did not only limit Plaintiff to "simple, routine tasks or unskilled work," but included additional restrictions in the RFC assessment, specifying the general educational development ("GED") reasoning level of work she could perform, that she could remain on task for two-hour blocks of time, the number of work days she would miss each month, and that she should have only occasional, routine changes in work setting and duties. *See* Tr. at 19.

Nevertheless, ALJ's analysis is devoid of an explanation linking the evidence she cited and the conclusions she reached as to Plaintiff's RFC. She stated "[t]he medical evidence [was] consistent with the residual functional

capacity" and proceeded to summarize the medical evidence. *See* Tr. at 19–20. She wrote: "Overall, the medical evidence does not support a finding of disability as within the meaning of the regulations." Tr. at 20. She stated she had considered "[t]he effects of fatigue, pain, and medication side effects." *Id.* She noted she had found Dr. Whitley's opinion persuasive and had "incorporated its findings into the assessed residual functional capacity." Tr. at 21. Although she indicated she found SW Ledlow's opinion "somewhat persuasive," as it showed Plaintiff had been helped by therapy, she also found it "not persuasive in that it is internally inconsistent with the statement there was no overall improvement in functioning." *Id.* She considered the state agency consultants' determinations to be persuasive, and indicated she had based the RFC assessment on their findings. *Id.* Despite having summarized this evidence and indicated the persuasiveness of the opinions, the ALJ did not link the evidence with her conclusions. Absent from her decision is any indication as to how the evidence supported each restriction she assessed in the RFC assessment or why Plaintiff's additional purported limitations were not supported by the evidence.

The ALJ failed to provide an adequate explanation as to how she considered Plaintiff's moderate limitations in concentrating, persisting, and maintaining pace in the RFC assessment. Although she found Plaintiff could work in two-hour blocks of time and would miss approximately one day of

work per month, she failed to specifically address Plaintiff's ability to complete an eight-hour workday. *See* Tr. at 18–21. Absent from the ALJ's decision is any explicit statement that Plaintiff could complete an eight-hour workday or perform the work specified in the RFC assessment over the course of an eight-hour workday. *See id.* She did not specify how many two-hour blocks Plaintiff could complete over the course of a workday or whether she would require excessive break periods between the two-hour blocks she could work. *See id.*

The ALJ also failed to resolve conflicting evidence and adequately explain how she accounted for moderate limitation in interacting with others in the RFC assessment. She acknowledged Dr. Whitley felt Plaintiff had "excessive anxiety dealing with . . . people in general," "would function best in a work setting with minimal interaction with . . . large numbers of co-workers," and "would decompensate quickly under anything more than simple levels of demands and expectations." Tr. at 20–21. However, she only precluded Plaintiff from participating in team-type activities, and declined to address the number of coworkers in whose proximity she could work or her ability to interact with supervisors. *See* Tr. at 19. The ALJ's decision lacks explanation as to how this restriction adequately accommodated the limitations Dr. Whitley observed.

Given the foregoing, the court finds the ALJ failed to comply with the requirements of 20 C.F.R. § 404.1545, SSR 96-8p, and Fourth Circuit precedent in assessing Plaintiff's RFC.

## III. Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

September 14, 2021                         Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge